IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TINA SCOTT for S.T.,

        Plaintiff,

v.

NANCY BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

OPINION AND ORDER

17-cv-18-slc

Pro se plaintiff Tina Scott, on behalf of her seven-year old son S.T., seeks review of a final decision by defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying her son's claim for supplemental security income (SSI) under the Social Security Act. 42 U.S.C. § 405(g). Following an administrative hearing on September 21, 2016, Administrative Law Judge (ALJ) Joseph Jacobson issued a decision on October 14, 2016, finding that although S.T. is severely impaired by attention deficit hyperactivity disorder (ADHD) and speech and language delays, these conditions do not meet, and are not medically or functionally equal to any impairment listed in the regulations. Scott has submitted two statements in which she briefly describes S.T.'s lifelong learning difficulties, autism and ADHD diagnoses, and some of the accommodations and treatment that he has received. Dkts. 17 and 19.

Having carefully reviewed the record and the parties' submissions, the court is persuaded that substantial evidence supports the commissioner's determination that S.T. is not disabled under the standard applicable to children in the Social Security Act, 42 U.S.C. § 1382c(3)(C)(i), and corresponding regulations, 20 C.F.R. § 416.924. The ALJ followed the commissioner's regulations, carefully considered and weighed the evidence of record, and explained the bases for his conclusions. Accordingly, I am affirming the commissioner's decision and dismissing this case.

# SSI PROCEDURE FOR CHILDREN

A child is disabled and eligible for SSI benefits if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(i). The commissioner employs a three-step process for determining disability, considering whether: 1) the child is presently engaging insubstantial gainful activity; 2) the child has an impairment or combination of impairments that is severe; and 3) the child has a medically determinable impairment or combination of impairments that meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, or is functionally equal in severity to a listed impairment. 20 C.F.R. § 416.924(a)-(d).

A child whose impairment neither meets nor is medically equal to a listed impairment may still be found disabled if his impairments are "functionally equal" to a listed impairment. 20 C.F.R. § 416.926a. Considering all medical and non-medical evidence in the record, the commissioner must assess the child's functioning in six "domains:" (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. § 416.926a(b). To establish functional equivalence, the child must have "marked" limitations in at least two domains of functioning or an "extreme" limitation in one domain. § 416.926a(a). A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete activities," and "[i]t is the equivalent of the functioning we would expect to find on standardized testing with scores that

are at least two, but less than three, standard deviations below the mean." § 416.926a(e)(2)(i). An "extreme" limitation exists when a child's impairment interferes very seriously with his activities and is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. § 416.926a(e)(3)(i).

## FACTS

### I. Background

S.T. was born on August 8, 2010, making him four years old when his mother, Tina Scott, filed an SSI application on his behalf, claiming that he had been disabled since birth because of developmental delays. AR 148. On September 19, 2014, Scott completed a function report stating that S.T. did not understand how to respect other children's space, sharing, or taking turns, and that he gets in a lot of trouble because of this behavior. She also wrote that although S.T. could count to 10, count up to three objects in front of him, identify shapes and colors, and report his age, he had trouble communicating his thoughts, using complete sentences, reporting his birthday and telephone number, understanding a joke, and defining words. *Id.* at 177-84.

### II. School Records

S.T. has had an individualized educational plan (IEP) since he entered preschool in 2013. AR 155, 187. His most recent IEP, which covered the period December 4, 2014 to December 3, 2015, was prepared on November 18, 2014, when S.T. was 4 years old and in the 4K program at his local elementary school. *Id.* at 230. The IEP noted that S.T. had significant

3

developmental delay and a speech or language impairment and although he had met all of his speech and language goals, he needed help understanding pragmatic and social rules and language. The IEP reported that S.T. had made "wonderful gains" in the past year but he still takes apart or runs off with other children's items, blurts out answers (sometimes unrelated to the topic at hand), does not play with toys as they are intended to be played with, often walks into people or objects and gets into "other's space," and has trouble focusing when in groups of 3 or more children. *Id.* at 233-34. The IEP noted that S.T.'s behavior did not impede his learning or the learning of others but stated that his communication needs could impede his learning. *Id.* at 236. The IEP estimated that S.T. had the receptive and expressive language skills of a 3.4 year old. The following services were recommended for S.T.: 30 minutes of speech and language therapy per week, 60 minutes of social and adaptive life skills throughout the day, and 30 minutes speech and language consultation with staff per month. *Id.* at 239.

On December 15, 2014, Valeri Scheps, S.T.'s school speech and language pathologist, completed a questionnaire reporting that she had been seeing S.T. for 30 minutes twice a week since March 19, 2014, but that pursuant to his November 18, 2014 IEP, he was receiving speech and language services for 30 minutes once a week. She wrote that the biggest area of concern for S.T. was understanding social rules and his use of social language but that his communication skills were "quite functional." Although she noted that S.T. often knew the answer to a question, he blurted out information and interrupted people and had a limited attention span of 2 to 5 minutes. Scheps estimated that the "intelligibility" of S.T.'s expressive language was 80-90%. She noted that S.T.'s assessment scores in language placed him at the level of a 3.4 year old. AR 480-81.

On January 9, 2015, Wendy Levy, S.T.'s early childhood and 4K teacher, completed a questionnaire, rating S.T.'s performance in each of the six functional domains from 1 (no problem) to 5 (very serious problem). Although she ranked S.T. as having a serious problem (4) in one activity related to "acquiring and using information," she ranked him as having an obvious problem (3) in all other areas. In the 13 activities related to "attending and completing tasks," Levy wrote that S.T. had a serious problem in three areas and a very serious problem in one area and no more than an obvious problem in all other areas. She found that S.T. had a serious problem in 7 of the 13 activities related to "interacting and relating to others" but in only 1 of the 10 activities relating to "caring for himself." Levy noted that S.T. had no serious problem in "moving about and manipulating objects" or "health and well-being." AR 273-80.

On October 12 and 14, 2015, when S.T. was 5.2 years old, he underwent an occupational therapy evaluation at his school because his 4K teacher reported that he exhibited fine motor delays (scoring only in the 5th percentile), clumsiness, and poor body awareness, acting "like a bull in a china cabinet." AR 492. The therapist, Donna Pond, also noted that S.T. was easily distracted and did not have good proprioceptive processing (getting input from his body about where his body is in space). *Id.* at 493.

III. Medical Evaluations

At the request of one of his therapists, S.T. underwent a psychological evaluation on October 2, 2015 with Dr. Mark Bjerke, who diagnosed S.T. with ADHD and global development delay. Dr. Bjerke noted that S.T. had trouble sitting still and following directions and wanted to play instead of completing the computerized assessment, resulting in him being

5

unable to finish the testing. Therefore, Bjerke made the diagnosis based on S.T.'s behavior during the evaluation and responses to questionnaires completed by S.T.'s teachers and parents. He wrote that S.T. did not have any medical issues and was not taking medication but had received speech and occupational therapy since preschool and had an IEP in place. Although S.T. parents' reported that S.T. sometimes is intrusive with his siblings or classmates, he gets along well with others. AR 494-99.

On November 17, 2015, S.T. was assessed for an autism spectrum disorder at the Autism and Behavior Center in Altoona, Wisconsin. Dr. Kristin Wegner determined that S.T. was not on the autism spectrum because he did not demonstrate persistent deficits in social communication and interaction, he did not exhibit repetitive patterns of behavior, activities or interests, and his reported deficits in developing and maintaining peer relationships were most likely a result of his ADHD, for which he was being medicated. AR 512.

**IV. State Agency Physician Opinions**

On February 25, 2015, S.T. saw Dr. Marcus Desmonde for a consultative examination which revealed that S.T. was cooperative; in good health; displayed good hygiene; spoke with age appropriate volume, fluency, and pace; was 95% understandable; and tested "low average" in processing speed and general language and "average" in verbal and performance. AR 471-72. Desmonde noted that S.T.'s scores ranked between the 15th percentile and 50th percentiles. *Id.*

On March 3, 2015, psychologist Kyla King, Psy.D. and speech-language pathologist Laurie Triller, M.S., reviewed the record and concluded that S.T. had less than marked or no limitations in all of the functional domains. AR 73-77. Psychologist Frank Orosz, Ph.D.

6

reviewed S.T.'s medical records on June 4, 2015, and reached similar conclusions as Dr. King and Triller. *Id.* at 86-88.

## V. Administrative Proceedings

On September 21, 2016, Scott and S.T. appeared pro se at a hearing before ALJ Jacobson. AR 12. S.T. testified that he is six years old and in the first grade but does not know how to read. He plays with friends at school and helps his mother with chores at home. AR 41-46.

Scott testified that S.T. can hold a regular conversation but looks to her for prompts and direction. AR 47-48. S.T. just started at a new school and has not yet made many friends. His communication difficulties and lack of focus and attention get in the way of S.T. making friends. AR 48. Although S.T. has an average IQ, he has a lot of problems with reading and he struggles a little with math because he cannot stay on task and has trouble retaining information and concepts. AR 49-50. S.T. is emotional, throws tantrums, and sometimes runs into other kids or knocks them over because he does not understand how to take turns. AR 51-52. Scott testified that she believes that S.T. is delayed in his social functioning and cannot remember the instructions or guidance she gives him in this area. AR 53. S.T.'s only physical problem has been clumsiness, which Scott attributes to his lack of focus. AR 54. S.T. also has problems toileting, bathing, fastening buttons and snaps, or tying his shoes independently, but he can brush his teeth. AR 55-56.

Scott testified that she did not believe that the clinic that tested S.T. for autism did a thorough job because they only spent 20 minutes with S.T. and that she wants to get a second

7

opinion. AR 57. With respect to S.T.'s ADHD, Scott testified that S.T. cannot sit still in school and he distracts other children. S.T. is on medication for ADHD and it sometimes helps his symptoms. His teachers have reported that he is able to focus a little better on school work. *Id.* at 58-59.

In a written decision issued on October 14, 2016, the ALJ concluded that although S.T. has severe impairments of ADHD and speech and language delays, they do not meet or medically equal any impairment listed in the regulations, including Listing 112.11 for ADHD. AR 15. The ALJ noted that although concerns had been raised in October 2015 about S.T. possibly having an autism spectrum disorder, an evaluation on November 17, 2015 ruled out the condition. *Id.* Relying on the opinions of the state agency physicians and the speech and language pathologists, and citing teacher reports and S.T.'s IEP, the ALJ concluded that S.T. was not disabled because he had less than marked or no limitations in each of the six functional equivalence domains. *Id.* at 17-29.

The Appeals Council denied Scott's request for review on November 8, 2016, making the ALJ's determination the final Agency decision. AR 1-5.

**OPINION**

A federal court reviews an administrative disability determination with deference and will uphold a denial of benefits unless the ALJ's decision is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Where

8

conflicting evidence allows reasonable minds to differ about whether a claimant is disabled, the responsibility for that decision falls on the commissioner, or the commissioner's designate, the ALJ." *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) (citation omitted). Thus, a reviewing court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

In her briefs, Scott does not identify any errors that the ALJ made in reaching his decision other than he reached the wrong conclusion about S.T. having an autism spectrum disorder and not being able to function at an appropriate level.

The ALJ correctly applied the required three-step analysis required to determine whether a child is disabled. Because S.T. had not engaged in any substantial gainful activity, the ALJ began the analysis at step two and determined that although S.T. is severely impaired by ADHD and speech and language delays, he had not been diagnosed with an autism spectrum disorder. In her submissions, Scott emphasizes that S.T. did not undergo a thorough evaluation for autism because it lasted only 20 minutes and was not performed by a neurologist in a hospital setting. However, under the Social Security Act, 42 U.S.C. § 223(d)(3), an impairment must result from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." A claimant's statements or beliefs alone cannot establish an impairment. 20 C.F.R. §§ 416.908, 416.928(a). In addition, "[t]he mere presence of some impairment [in the medical records] is not disabling per se." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also Garmon v. Apfel*, 210 F.3d 374, at *4 (Table) (7th Cir. Mar. 22, 2000) (rejecting claimant's argument that he had severe impairment because

9

he sought medical treatment for various symptoms).  As the ALJ noted in his written decision, S.T. did not exhibit persistent deficits in social communication or interaction or restricted, repetitive patterns of behavior, interests and activities associated with autism.  AR 15.

At step three of the analysis, the ALJ relied on the opinions of the state medical consultants and found that S.T.'s severe impairments did not meet or medically or functionally equal a listed impairment in severity.  Scott does not suggest that T.L.'s impairments meet or are medical equivalent to a listed impairment, and the record does not appear to support such a conclusion.  *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (opinions of state agency physicians constitute substantial evidence of whether claimant meets or medically equals any listing in absence of contrary medical opinions).  Rather, Scott's arguments seem to relate to the ALJ's functional equivalence determination.

After reviewing S.T.'s medical records, IEPs, teachers' evaluations, family members' reports, and the opinions of the state medical consultants, the ALJ concluded that S.T. had less than marked limitations in the functional domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects and caring for self, and no limitations in the functional domain of health and physical well-being.  As explained above, for S.T. to be found disabled, he would have to have marked limitations (or serious problems) in two of the six domains or an extreme (or very serious problem) in one domain.  Neither Scott nor any of S.T.'s teachers or providers indicated that S.T. had any serious problems in the area of health and physical well-being.  Scott and S.T.'s teachers have pointed out difficulties that S.T. has with various activities in the areas of acquiring and using information, attending and completing tasks, interacting and relating with

others, moving about and manipulating objects, and caring for himself, but as explained below, the record shows that the ALJ's decision is supported by substantial evidence.

### A. Acquiring and Using Information

Acquiring and using information refers to how well a child acquires or learns information and how well he uses the information he has learned. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009) (citing 20 C.F.R. § 416.926a(g)). Pre-school children between the ages of three and six should be able to learn and use the skills that will help with reading, writing, and math, including listening to stories, rhyming words, matching letters, counting and sorting shapes, painting, coloring, asking questions and giving answers, following directions, describing things, and explaining what they mean. 20 C.F.R. § 416.926a(g)(2)(iii).

Scott reported that S.T. has had an IEP since attending preschool, his reading and language skills were below average for his age, and he has great difficulty remembering and processing information. However, the ALJ correctly pointed out that in December 2014, S.T.'s speech and language therapist stated that she had been working with S.T. since March 2014 and his speech intelligibility, voice, and fluency all were within normal limits. She also noted that S.T.'s performance improved by the time his November 2014 IEP, reducing his need for speech therapy from 60 to 30 minutes a week. In January 2015, Levy, S.T.'s 4K teacher, noted that S.T. had less than serious problems in nine out of the 10 activities associated with acquiring and using information. In February 2015, Dr. Desmonde found S.T. to be "low average" in processing speed and general language and "average" in verbal and performance. Accordingly,

the ALJ reasonably concluded that S.T. did not exhibit the type of serious or very serious problems required to find a marked limitation in this functional domain.

### B. Attending and Completing Tasks

Attending and completing tasks refers to how well a child is able to focus and maintain attention and how well he begins, carries through, and finishes activities. *Hopgood*, 578 F.3d at 700-01 (citing 20 C.F.R. § 416.926a(h)). Preschool children should be able to pay attention when spoken to directly, sustain attention to their play and learning activities, wait their turn and change activities when told to do so, and concentrate on activities like putting puzzles together or completing art projects. 20 C.F.R. § 416.926a(h)(2)(iii). They also should be able to focus long enough to do things like getting their clothes together, dressing themselves, feeding themselves, and putting away their toys. *Id.*

Although the ALJ acknowledged S.T.'s ADHD diagnosis and S.T.'s reported difficulties with paying attention, staying on task, and following through with activities, he noted that the state consultants who reviewed these same records did not find that S.T. had marked limitations in this area and that subsequent reports showed that S.T.'s attention issues had improved with prescription medication. At the hearing, Scott admitted that the medication sometimes helped and that S.T.'s teachers reported that he is focusing better at school while taking it. Therefore, even though there is strong evidence that S.T. had deficits in this functional domain, none of the medical evidence counters the state agency physicians' opinions that those deficits rose to the level of a marked or extreme limitation.

### C. Interacting and Relating with Others

"Interacting and relating with others refers to how well a child initiates and sustains emotional connections with others, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others." *Hopgood*, 578 F.3d at 702 (citing 20 C.F.R. § 416.926a(i)). Preschool children should be able to socialize with others, develop friendships with children their own age, use words instead of actions to express themselves, choose their own friends, play cooperatively, and be better able to share, show affection, and offer to help. 20 C.F.R. § 416.926a(i)(2)(iii). They also should initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what they say most of the time. *Id.*

The ALJ noted the social communication and relationship problems that Scott, Levy, and S.T.'s speech therapist had reported, some of which Levy ranked as serious problems. However, the ALJ found that Levy had implemented behavior modification strategies in the classroom to address these issues and that by all accounts S.T. was pleasant and friendly and generally got along well with others. By 2015, S.T. also reportedly had a good vocabulary and engaged in intelligible communication most of the time (at least 80%). As Scott described, S.T.'s primary problem was that he is not always aware of what is going on around him, which causes him to run into things or people or not be mindful of their personal space. Again, although S.T. certainly has difficulties in this functional domain, the evidence of record does not necessitate a finding of a marked or extreme limitation in this area, especially in light of the state agency physicians' opinions to the contrary.

**D. Moving About and Manipulating Objects**

The domain of "moving about and manipulating objects" relates to a child's physical ability to move his body from one place to another and to move and manipulate things and requires gross or fine motor skills, or a combination of both. Soc. Sec. Ruling 09-6p; 20 C.F.R. § 416.926a(j). Preschool children should be able to walk and run with ease and show developing fine motor skills, including increasing control of crayons, markers, small pieces in board games, and scissors and the ability to manipulate buttons and other fasteners. § 416.926a(j)(2)(iii).

Although S.T. has been described as clumsy and like a bull in a china [shop], there is little evidence that he has serious or very serious problems with his gross motor skills. Both his mother and teachers seem to attribute these behaviors to his lack of attention. The ALJ correctly pointed out that an October 2015 occupational therapy evaluation revealed that S.T.'s fine motor and visual motor skills were delayed (in the 5th and 16th percentiles respectively). However, the occupational therapist described these results as being in the "poor" and "below average" range. In addition, Levy did not note that S.T. had serious problems in the various activities related to this functional domain.

**E. Caring for Self**

Caring for self refers to how well a child gets his physical and emotional wants and needs met in appropriate ways, how he copes with stress and changes in his environment, and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k). Preschool children should want to take care of many of their physical needs by themselves and

to try doing some things that they cannot do fully independently, including tying their shoes, climbing on a chair, and taking a bath. 20 C.F.R. § 416.926a(k)(2)(iii).

The ALJ recognized that S.T. has problems with toileting, bathing, fastening buttons and snaps, and tying his shoes independently. However, there is no evidence that these problems rose to the level of "marked" limitations or that S.T. had significant issues in the other areas related to caring for oneself. As the ALJ pointed out, S.T.'s 4K teacher found no serious problems in this area and reported that she had some success using a praise and reward system because S.T. had started following classroom rules and raising his hand for help.

**E. Conclusion**

The ALJ's findings are well-reasoned and supported by substantial evidence in the record. Although Scott and a 4K teacher reported that S.T. had significant problems with retaining information, maintaining attention, social relationships and hygiene, no treating physician or provider clearly indicated that S.T. had marked or extreme limitations (as those terms are defined by the federal regulations) in any of the six functional domains or that his symptoms even significantly impaired his ability to function in the classroom. Scott points out that a later application for benefits that she filed on S.T.'s behalf was approved, but an ALJ's decision is reviewed based on the record that was before the ALJ at the time of the decision. *Stepp v. Colvin*, 795 F.3d 711, 722 n.2 (7th Cir. 2015); *Eads v. Sec'y of HHS*, 983 F.2d 815, 817 (7th Cir. 1993).

In the absence of other contradictory evidence available at the time of the hearing in this case, the ALJ was entitled to consider the state agency consultant reports and attribute them significant weight. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) ("ALJ may properly rely

15

upon the opinion of these medical experts"); 20 C.F.R. § 416.927(f) ("Administrative law judges must consider the findings of State agency medical and psychological consultants . . . as opinion evidence. . ."); SSR 96-5p (ALJ must consider state agency consulting reports as expert opinion evidence and address them in the decision). Because I am persuaded that the ALJ built a sufficiently accurate and logical bridge from the evidence to his conclusion, I am affirming the commissioner's decision and dismissing Scott's appeal. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

**ORDER**

IT IS ORDERED that the decision of defendant Nancy Berryhill, Acting Commissioner of Social Security, is AFFIRMED, and that plaintiff Tina Scott's appeal on behalf of S.T. is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 7th day of March, 2018.

BY THE COURT:

/s/
STEPHEN L. CROCKER
Magistrate Judge